The next case for argument is 03-35412, Oregon Laborers-Employers Pension Trust Fund. Good morning, your honors. My name is Harvey Rockman. I represent the Oregon Laborers Plans. I want to just spend a minute on the individual recovery issue, which has been heard and much has been said. The point I want to make goes to Judge Fletcher's question early on, probably in the first hearing, as to whether or not these set-offs would be permitted at all under the law in the Ninth Circuit period. And the fact is that the case is cited by the receiver, in-ray equity funding, the concrete and cement case. They do not support the set-off in this case. You don't need to reach ERISA. You don't need to reach the collateral source rule, although that applies as well. The point of both of those cases is that where you have a pot created by dependents who are jointly and severally liable, there should be a set-off or some sort of pro-rata pooling and distribution in that case. That's only fair and equitable, because otherwise you risk the chance of an actual double recovery. And those cases depend on that fact. And the collateral source rule is consistent in that there is an exception to the collateral source rule for cases in which you have joint and several liability of a tort feeser. The cases that we're talking about, the separate recoveries, are all from individual claims that only one claimant or maybe a couple of claimants have based on their own specific relationship with a third party. It's not mitigation of losses of CCL either. Mitigation is where you collect up everything that CCL had and you sell it and you use it to reduce the loss. This is simply damage claims against third parties. The only case that we were able to find that really related to this was not in the Ninth Circuit, but is in the Seventh Circuit, the Fisher v. Apostolo case and the In re Lake State's bankruptcy, which was on remand. And in that case, they were very careful to say that only where the claims were actually identical, where the claims that the receiver or trustee were bringing were identical to the claims that were being brought by victims separately should there be a set-off. That was a much better case for a set-off, too, because in that case, they were simply talking about different types of claims against the same pool of defendants. The victims had some additional claims over those that the trustees could arise. So in this case, there's simply no precedent to support these set-offs, and that can be the end of the story right there. Or we could say that this case is unique on its facts because of the size and scope of it, the number of claimants, the fact that some were ERISA plans and some were simply private investors. I mean, it's a pretty unusual case. Well, it's an unusual case. It's a big case, but I don't think there's any aspect of those aspects of the case which suggests that the standard rule about set-off, that the set-offs that are appropriate are where there's joint and several liability, doesn't apply to this case. Those rules are set up to prevent this kind of double recovery situation and create a fair pooling, and they're limited in such a way as to prevent the receiver or trustee from basically laying their hands on the separate property of claimants. But I guess my brother's earlier questions about whether or not ERISA really even applies in this case, the issue here really is we're in an area of federal receivership law, which is non-statutory. It is as much judicially created, and we look to analogous situations in state law to help guide us. And perhaps if Fletcher is right, the guiding principle is we try to treat equal classes of claimants equally. But beyond that, there's not much in the case law that guides us. Well, the cases that I'm talking about and that I'm citing to you involve just this kind of thing. The Fisher case in the Seventh Circuit involves a Ponzi scheme where a lot of people were defrauded. There were individual claims by the claimants. There was a trustee appointed to liquidate and to go after the same group of defendants. The cases that the receiver cites, which he claims are on relatively all fours in this unique case, in-ray equity funding and the cement and concrete case, they don't support these set-offs because they're about joint and severally liable defendants. I'd like to move on to the issue that the Oregon laborers have raised that the other plans have not raised, which is the plans treatment of the public securities. And this plan distributed two-thirds of the assets, $500 million in public securities, directly to the people that supposedly owned those securities at the time of the receivership. After already proving and making a key point of the receivership plan that whoever owned anything at a particular time was only a matter of chance, and making the discretion that CCL had over all of the assets the core point and the core principle for pooling together. CCL, under the receivers' investigation, had discretion over everything. However, instead of pooling those assets, the receiver distributed them. He did so on an interim basis very early on in the case. With the reserving all rights, the receiver specifically identified the inequity of not making an adjustment for the distribution of the public securities. And he singled out my clients, the Oregon laborers, in his second amended distribution plan, saying if you compare the Oregon laborers, which were identified as Client C, with the plumbers that were identified with Client D, that shows you the extreme inequity of not accounting for the public securities distribution. Let me ask you this. Before everything was exposed, when the plan was going forward and Capital Consultants was still in business but defrauding, were the clients who held through Capital Consultants public securities, were they informed of the list of securities that they held? I understand it was discretionary sometimes, or maybe most of the time, as to whether or not their funds would be invested in public securities. But were they informed? I don't know. I think a little bit of this is in the record. There were periodic statements that were made to the clients that had their private and their public securities on it, in some cases mixed in together. There's in the statement for the appraisal of the Missouri-Kansas sheet metal workers, actually I recall in the record actually shows some public securities and some private securities. But the point is when you appoint an investment manager, they have total power over your portfolio. If the trustees actually make a decision about the assets, the discretion is invaded and the trustees are liable for the decision. So CCL relied on that discretion completely in order to Yeah, but I'm asking a slightly different question. I'm not quite sure what the full legal consequence is of the answer. But I'm trying to figure out if an investor, as four years before everything blows up publicly, bad things are going on but nobody knows on the outside about the bad things, does that investor know, okay, I've got $50 million invested through these people and $30 million of it is in these public stocks. I've got $20 million over there in these loans. The reason I'm asking the question is that to the extent that there was fraud, it was really over there in the private investment sector. I gather the public investor sector, you know, maybe they weren't great investments, but they were kind of normal stock market investments. This is a key point. There's no evidence of any investigation of whether there was fraud in the public securities. There's no evidence in the record whatsoever that there was no fraud. That there was or was not fraud actually in many of the private investments, such as the AT&T building that we own. There is no evidence of that because fraud was not the principle on which this receivership was conducted and therefore it was not brought to the court's attention. I want to quote for you what the receiver actually said, and he cited this court's decision in North American Coin and Currency. And this is how the receiver described it to the court repeatedly in three or four different briefs. Even where the pre-receivership operations are not fraudulent, courts have refused to allow tracing of assets where to do so would promote the unequal treatment of similarly situated creditors. The point of this receivership was discretion, and no one disputes the fact that discretion covered all the securities whatsoever. The court was never presented with the argument made by the receiver now that there wasn't fraud in the public securities. There's no evidence in the record of that, and there was no discretion exercised on that issue. It's simply a new fact. It's not even a fact. It's not in the record. So, you know, this receivership ultimately violates the cardinal principle of equity receiverships. All assets controlled by the wrongdoer are pooled and distributed rateably. I'd like to reserve the last minute of my time. I'd like to address the public securities issue. I think we've exhausted the third-party recovery issue at this point. First, I would take issue with counsel's characterization of the Fisher case out of the Seventh Circuit. That case was actually a situation where a trustee in bankruptcy sought or asserted claims against certain defendants, and then individual claimants also asserted claims against those same defendants for the same damages. They may have had certain differing theories, and the question for the court there was should the trustee be allowed to move forward with those claims and the other claimants enjoined from pursuing those same defendants for the same damages. Not at all the case that we have here. But could you respond to the argument that's just been made, and that is, realistically, what we have here is investments by these clients. Here's my $20 million. Here's my $50 million. Invest it as you think proper and prudent. Some of it gets put in the private investment. Some of it gets put in the public investment. And then everything goes belly up after a time. Why should the public and the private investments be treated differently, as they clearly are under the plan? What justifies that difference in treatment? Absolutely. There was, in the receiver's judgment, the fraud, the negligent underwriting, the swapping of clients in and out of investments, and the ultimate Ponzi scheme that developed with respect to the Wilshire debacle happened only on the private investment side. And there was no evidence that clients were being swapped in and out of publicly traded stocks. It was a buy and hold program. In answer to your earlier question, they got account statements that showed the public investments that they were in. But as I understand the record, it was, as the district court or perhaps you characterized it, purely a matter of chance as to whether CCL decided to put one particular client in publicly held stock versus real estate or private investment. Within the private investment portfolio, yes. But the investment advisory agreements often had categories, that is, so much in public and so much in private. I don't think the receiver ever said it was a matter of fortuity as to whether a particular client's money was invested in public stocks or a particular public stock. Okay, but I misunderstood the briefing because I thought what the argument was, was that CCL decided whether to take $5 million worth of claimant A's assets and put it in public stock as opposed to participating in some private real estate. If a particular client's investment advisory agreement gave CCL 100 percent discretion to do whatever it wanted with the money, then yes, you are correct. To the extent it put money into the public's, that was CCL's choice. So only if the client said, I'm giving you $5 million, but the only thing I'm going to allow you to do is to invest it in the public stock market, and you're not authorized to invest it in anything else, then in hindsight that turned out to be a more prudent investment decision than those claimants who simply gave their asset to CCL and said, do with it what you will get us the best return you can. Perhaps, depending on how the particular public securities happen to perform. But in the public securities side of things, CCL wasn't going out and underwriting loans, evaluating collateral, moving clients back and forth in between investments to try to prop them up, extending loans when they matured and couldn't be paid off. They took the client's money, they bought the public securities, and there they were. Do we know from the record how many clients or what percentage of the money that was coming in from these clients was entirely unrestricted as to how it was to be invested as between public and private? No, there are no – I do not believe there are any definitive – there's a definitive breakdown on that. So 90% of the clients, as far as the record shows us, could have said there's no restriction, you can do anything you want with it. Or 90% of the clients, as far as we know, could have said, listen, I only want to go 50-50, no more than 50% outside of public stock. We just don't know. Well, in the receiver's reports, the interim reports, and I believe it's in the very first one, which is in the record, there is a description of the various types of investment advisory agreements. I don't know that there is a specific count as to there were 50 like this, 100 like this, 150 like this, but there is in the receiver's first report a description of the varying types of IAAs, total discretionary limits on the percentages of investments that could be in each category, et cetera. As I stand here, I'm sorry, the record is extremely voluminous, I can't tell you what those numbers are. Okay. And at the time of the receivership institute, my understanding is that there were – I read both a number almost 300 and then I read a number 301, but we're talking about 300 clients more or less? Correct. And I believe the number is that 285 of them were invested in both private and public. So if the math is correct, that would leave 16 only in the public. Another distinguishing factor is that these were identified public securities, easily portable, transferred to Merrill Lynch or whatever other broker the client decided they wanted to move them to. And although the receiver did reserve the right at the very beginning, and Mr. Rockman is correct, because the receiver didn't feel it was appropriate to be managing a whole bunch of people's public stock portfolios, he did seek authority from the court to release those early on with a reservation that if appropriate and necessary later on adjustments could be made. However, by the time two years later that the plan of distribution was proposed to the court, the receiver determined that it wasn't appropriate or necessary, and although not impossible in the strictest sense, the administrative burden at the expense of the time consumed far outweighed any benefit or any strong cause for having to do it, given the apparent absence of fraud or funny business on the public investment side. Thank you. First, I want to reiterate, there is not a shred of evidence in here of the absence of fraud in the public securities. In fact, there is evidence of the clear connection between the fraud in the public securities and the public securities sector, and that's identified in our brief. Second, I would like to direct the court to page 39 and 40, where we have a bullet point summary of the specific connections with references to the record. There was money taken from the public securities and put against all agreements into the private securities in order to, quote, feed the Ponzi scheme. They consistently breached whatever restrictions there were on anything that they had. And, you know, this Court can't ‑‑ I don't see how it's possible to affirm on the basis that there is fraud and that fraud is the distinguishing feature when there isn't any evidence of whether it was. And that principle would not support the actual existing plan as it exists because you would also need to look at all the private investments and determine whether there was fraud in those. You know, we've said, look, we own a building. There's no fraud in that building. Why shouldn't that be excluded also? The receiver's supposed determination is not made up or based on any material evidence that was presented to the court. The only ‑‑ whenever you see that in their briefs, you can look at the evidentiary site and it just says something very similar to the receiver made a determination. That's it. No evidence. There's nothing for the court to evaluate. Another thing is it's just not the case that the record doesn't show that there was unfettered discretion throughout the whole CCL realm. The first amended receiver's report says that it talks about on page 152 of the record and 153 of the record the typical investment management agreement, IAA, allowed for what they describe as unfettered discretion. Thus, under this IAA, CCL could allocate up to 70% of the client's A's money in private investments and only 23% to public investments. Alternatively, CCL could allocate 90% of client A's money to public investments and only 10%. The next page goes on to say even those restrictions were routinely breached whenever CCL wanted to, and that was the basis of this distribution plan. So, you know, what we're left with is an attempt to shore up a decision that was made somewhere along the line where there's no evidence left. There's also no evidence on the administrative burden point. That point wasn't made to the court, and there was no exercise of discretion on that either. You see, the district court did not address the administrative burden that might be involved if we were to toss the public securities into the pot? That's right. There was no declaration or other evidence or even discussion on the part of the receiver about what administrative burden that would take. He simply said, we are not including it. If you look at the motion, that's precisely what it says. And the court doesn't even look at it in the order, and there was no evidence on which to do it. And it's not at all clear that there would be a heavy administrative burden. In fact, in going through the plan and in coming up with the plan, the receiver and the court, and we discussed this a little bit in our brief, decided that it would be much easier to make an allocation and an adjustment on the public securities because the values were clear. You didn't need to go and get an appraisal. The AT&T building, which they're simply proposed to deduct the amount, the valuation of it by an appraiser off the dividend that we're getting, was a more complicated treatment than, say, saying they had 100 shares of IBM. We gave it to them on an interim basis. It was part of this pool of CCL assets. We said we were going to adjust for it. We never changed that. And, you know, that share, 100 shares of IBM, is worth X amount. So you would otherwise get, you know, $200 from the receivership. Now you're getting $100. Thank you very much, Your Honor. Thank you. 03-35412, Oregon Laborers' Employers' Pension Trust Fund, is now submitted for decision. And we've got one last one on the argument calendar, and that's 03-35407, United Association, Union Local 290, Plumbers Team, Freighter, Shipfitter, Industry Pension Fund.
judges: Reavley , W. Fletcher, Tallman